UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

Verdell Kennedy,

    Defendant.

Criminal No. 15-20094

Hon. Matthew F. Leitman

**United States' Response Opposing the Defendant's Renewed Motion for Compassionate Release Post Covid Surge**

The United States of America, by and through Assistant U.S. Attorney, Patrick E. Corbett, submits this response pursuant to the Court's December 17, 2020, Order requiring a response. This is Kennedy's third motion for compassionate release since May 4, 2020. The Government incorporates by reference the response and exhibits filed on May 21, 2020 (**ECF No. 286, PageID.1237**), the supplemental brief filed on June 8, 2020 (**ECF No. 288, PageID.1284**), and the response filed on September 2, 2020 (**ECF No. 294, PageID.1308**). In this response, in addition to submitting a summary of the case that highlights a few passages from earlier filings, the Government will provide an update with relevant facts provided by Ryan Nelson, Senior

1

Attorney, Federal Bureau of Prisons Consolidated Legal Center, after consultation with staff at FCI Ashland (Ashland), and from the Bureau of Prisons website.

## Background

On September 1, 2015, Kennedy pleaded guilty to conspiracy to commit wire fraud. Kennedy had been detained from March 10, 2015, until September 10, 2015, at which time Judge Battani authorized Kennedy's release pending sentencing. On March 30, 2016, while out on bond, Kennedy was arrested for the same type of fraudulent activity as in this case. Kennedy was attempting to purchase jewelry using a fraudulent credit card. After his arrest, deputies recovered from his person a total of nine fraudulent credit cards as well as a false identification. **ECF No.218, PgID.895-896** (Government's Sentencing Memorandum).

On May 12, 2016, Judge Battani sentenced him to the top of his guideline range, due in part to his committing the same type of crime while out on bond. **ECF No. 223, PgID.908** (Judgment); **ECF No. 231, PgID.964-966** (Sentencing Hearing); **ECF No. 218, PgID.896** (Government's Sentencing Memorandum).

Kennedy began serving his current sentence of 105 months in prison on July 19, 2016. His projected statutory release date is April 5, 2023, and his full term expires July 20, 2024. Exhibit One (Public Information, Inmate Data, 12-16-20). Kennedy filed his initial motion for compassionate release on May 4, 2020. **ECF No. 278, PageID.1105.** This Court denied this motion for compassionate release on June 10, 2020. **ECF No. 289, PageID.1292.** Two months later, on August 13, 2020, Kennedy filed a renewed motion for compassionate release. **ECF No. 290, PageID.1294.** The Court denied that motion on October 7, 2020. **ECF No. 297, PageID.1328.** Two months later, on December 17, 2020, Kennedy filed this second renewed motion for compassionate release. **ECF No. 300, PageID.1356**. Like his first two motions, his second renewed motion should also be denied.

## Argument

**I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

As the Court already knows, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. "Since the release of the Attorney General's original memo to the Bureau of

3

Prisons on March 26, 2020 … to prioritize home confinement as an appropriate response to the Covid-19 pandemic, the BOP has significantly increased its placement of offenders on home confinement. Currently, the BOP has 8,015 inmates on home confinement. The total number of inmates placed in home confinement from March 26, 2020 to the present (including inmates who have completed service of their sentence) is 19,654." *See* [BOP Covid-19 Website](#) (last visited January 4, 2021). For comparison, when the Government responded to Kennedy's initial motion on May 21, 2020, 2,932 inmates had been released to home confinement. **ECF No. 286, PageID.1239.** And, as of November 23, 2020, at least **137** defendants from the Eastern District of Michigan have been released into home confinement. The BOP has clearly worked to make home confinement—when appropriate—a high priority.

## II.  The Court should deny Kennedy's renewed motion for compassionate release.

*A. Kennedy's medical condition*

In connection with the original motion and his first renewed motion, the Government acknowledged that, during the Covid-19 pandemic, Kennedy's Type 2 diabetes presented a qualifying medical condition under 18 U.S.C. § 3582(c)(1)(A)(i), and therefore, was "extraordinary

4

and compelling" under USSG 1B1.13(1)(A). **ECF No. 286, PageID.1239; ECF No. 294, PageID.1310**. Because Kennedy still appears to have Type 2 diabetes, the Government continues to acknowledge that, during the Covid-19 pandemic, Kennedy's diabetes presents a qualifying medical condition under 18 U.S.C. § 3582(c)(1)(A)(i) and guideline policy statement, USSG § 1B1.13. Nevertheless, he is still not entitled to release.

The acknowledgement that Kennedy has a qualifying medical condition, however, does not suggest that the medical staff at Ashland, where Kennedy is presently living, is not addressing Kennedy's needs. At the October 7, 2020 hearing on his first renewed motion for compassionate release, Kennedy asserted he was not getting proper medical care. This Court asked Government counsel to request that Ashland have a doctor look at Kennedy. Upon making that request, Ryan Nelson, Senior Attorney, Federal Bureau of Prisons Consolidated Legal Center, stated that Kennedy "can sign up for a sick call visit any time he wants. And has regularly scheduled chronic care visits, so in a practical sense, he is already scheduled to see a doctor." Nelson also provided medical records revealing that in the three months prior to the

5

October 7, 2020 hearing, Kennedy received medical care on three occasions (July 13, 2020, September 1, 2020, and September 24, 2020). After the October 7 hearing, Kennedy visited a health care professional on November 6, 2020, December 4, 2020, and December 10, 2020. Exhibit Two – 2020 Health Records (filed separately under seal).

On November 6, 2020, Kennedy was examined at the Chronic Care Clinic. The treating physician recommended Kennedy start taking Insulin for his Type II diabetes. The notes reflected that Kennedy chose not to follow this recommendation: "The pt does not want to start Insulin at this time. The pt understands the risk of MI, Kidney failure, CVA, vision loss, and death." Other than a discussion about his blood pressure, the notes indicated that the "pt has no other new questions or concerns." *Id*. at 3. The notes further reflected "Follow-up at Sick Call as Needed" and "Follow-up at Chronic Care Clinic as Needed." *Id*. at 6.

On December 4, 2020, Kennedy was tested for Covid-19. The test came back negative. *Id*. at 2.

On December 10, 2020, a "Sick Call Note encounter [was] performed" on Kennedy. Kennedy requested and received a blood glucose check. The notes further reflected "Follow-up at Sick Call as Needed." *Id*. at 1.

6

Lastly, the medical notes reflected that Kennedy has laboratory tests scheduled for January 4, 2021, April 5, 2021, July 5, 2021, and October 4, 2021, as well as a "Follow-up" or a "Chronic Care Visit" scheduled for January 18, 2021, April 19, 2021, July 19, 2021, and October 18, 2021. *Id.* at 5-6.

There is simply no reason to believe that, due to Covid-19 or any other reason, Kennedy is not getting proper care and will not continue to receive that care as needed.

*B. Application of USSG 1B.13*

Defendant's reference to *United States v. Jones*, 980 F.3d 1098 (6th Cir. Nov. 20, 2020), should not affect this Court's use of USSG § 1B1.13. As the Court knows, a Sixth Circuit panel recently concluded in *United States v. Jones*, that § 1B1.13 is not "applicable"—and thus does not apply at all—to defendant-initiated motions for compassionate release. *Id.* at 1101.

*Jones*'s analysis on that point was incorrect, and the Government preserves for further review its argument that USSG § 1B1.13 is binding here and that Kennedy has failed to satisfy its requirements, because of the lifelong danger he has presented to the community.

7

Further, as Judge Cook's concurrence made clear, the *Jones* panel's discussion of § 1B1.13 was dicta. *Jones, Id.* at 1116 (Cook, J., concurring). The only holding in *Jones* was that the district court there did not abuse its discretion in denying release based on the § 3553(a) factors. *Id.* So the remainder of the panel's opinion is not binding. *See Wright v. Spaulding*, 939 F.3d 695, 700–02 (6th Cir. 2019) (explaining that "only holdings" and "not dicta" are binding in subsequent cases).

But even if the Court were to follow the dicta in *Jones*, § 1B1.13 continues to "provide a working definition of 'extraordinary and compelling reasons,'" which can "guide" a district court's decision "without being conclusive." *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. Nov. 20, 2020). And even without § 1B1.13, the plain language of the compassionate-release statute does not permit "a sort of Wild West" or allow "every district judge [to] hav[e] an idiosyncratic release policy." *Id.* The analyses of the Sentencing Commission, as represented in § 1B1.13 and its Application Notes, and the BOP Director should still be "given substantial weight," and "strik[ing] out on a different path risks an appellate holding that judicial discretion has been abused." *Id.*; *see also Jones*, 980 F.3d at 1112 (quoting with approval a prior panel's

8

observations that "'discretion' does not mean 'whim'" and "[a] court might abuse its discretion, for example, if it misreads the meaning of the extraordinary-reason requirement").

As such, even though Kennedy's diabetes presents a qualifying medical condition under USSG 1B1.13(1)(A), his offense and criminal history show that he is a danger to the community, *see* USSG § 1B1.13(2), because, as is apparent from a review of his presentence report, Kennedy has spent his entire life stealing from others, fraudulently using others' identities, and attempting to thwart law enforcement efforts to stop him. *See* **ECF No. 286, PageID.1258-1263** (Government's May 21, 2020 Response Opposing the Defendant's Motion to Modify Sentence for Compassionate Release).

*C. Factors under 18 U.S.C. § 3553(a)*

Moreover, the factors under 18 U.S.C. § 3553(a)—also fully discussed in the Government's Response on May 21, 2020—do not support release. *See* **ECF No. 286, PageID.1263-1268**. Kennedy's underlying federal crime victimized thousands of people. Release at this time would depreciate the seriousness of this offense. Moreover, Kennedy engaged in other fraudulent activity while on bond in this very case. His lifelong

9

attraction to committing crime—with no regard for its impact on his victims—demonstrates that he needs to be incarcerated in order to deter him from committing more crime and further endangering the community.

And, while the BOP recently revised the Prisoner Assessment Tool Targeting Estimated Risk and Needs (PATTERN),[1] which resulted in Kennedy's Risk Level Category dropping from "medium" to "low" (as it did for 9,162 federal male inmates), a "low" score still indicates a 31% risk of recidivism, strongly indicating he is likely to return to crime upon release. Exhibit Three (Inmate History, First Step, 12-16-20). *See also* The Attorney General's First Step Act, Section 3634 Annual Report, at *5-6 (December 2020) (https://www.bop.gov/inmates/fsa/docs/20201221_fsa_section_3634_report.pdf). A recent case in the Eastern District of Michigan, *Segars v. United States*, 2020 WL 3172734, at *4 (E.D.MI. June 15, 2020), demonstrates that a "minimum" or "low" score should not be relied upon as a defining factor. In *Segars*, the Court released the defendant, finding Segars was not a danger to the community due, in part, to the

---

[1] The tool is meant to be a predictive tool to assess whether someone is a high, medium, low, or minimum risk for reoffending based on several characteristics, or "risk factors."

Court finding the defendant presented a "low risk of recidivism," affirmed by the BOP's "minimum" recidivism score. Six months later, a complaint was issued alleging that Segars fired a handgun at two victims "approximately eight times … hitting each of them multiple times." Exhibit Four (Criminal Complaint, No. 20-mj-30533, Ronald Segars).

D. *Conditions at Ashland*

The Government acknowledges that Ashland had a Covid-19 problem in November 2020. **ECF No. 300-1, PageID.1369 (**Defendant's Exhibit 2, November 24, 2020 Warden Memorandum noting 21 staff cases of Covid-19 and 183 inmate cases). While it appears to have temporarily worsened in November 2020 (in total, 6 inmates died and 321 inmates had Covid-19 and recovered), the problem now appears to be under control. As of January 4, 2021, approximately 4% of the inmate population had Covid-19 (38/963 total inmates). BOP Covid-19 site (https://www.bop.gov/coronavirus/); Ashland Homepage (https://www.bop.gov/locations/institutions/ash/).

In denying Kennedy's initial motion and his first renewed motion, the Court considered a supplemental brief and response which provided

11

some specific information regarding Ashland, the facility where Kennedy resides. **ECF No. 288, PageID.1284; ECF No. 294, PageID.1308.** Given the November 2020 Covid-19 problem at Ashland, BOP Senior Counsel, Ryan Nelson, sought and received some additional information from Ashland. In addition to the precautions noted in earlier briefs, Ashland has taken additional steps to protect inmates in response to November 2020 increase in Covid-19 cases:

- Ashland is on "Modified operations," and all food is taken to the unit and delivered to the inmates. Ashland began serving commissary again as of December 15, 2020. Phone and email has continued with slight variances since August.

- Numerous inmates have been tested, due to the increase in positive cases at Ashland.

- Inmates are tested based on CDC guidelines.

- Inmates are tested who are showing symptoms.

- Inmates are tested based on contact tracing due to the increase in Covid-19 cases.

- Currently, Ashland had a moratorium on receiving inmates due to the November 2020 Covid-19 cases. Movement will be reevaluated beginning January 2021.

- All new inmates are Covid-19 tested. They are then placed in quarantine for 14 days, and then re-tested with a PCR test, before being released to General Population.

While in no way intending to minimize the seriousness of the increased number of Covid-19 cases at Ashland in November 2020, it

12

appears that Ashland has addressed—and continues to address—this outbreak. And, as the medical records show, medical professionals at Ashland continued to provide Kennedy with medical care in November and December 2020, including a Covid-19 test on December 4, 2020 that came back negative.

The risk of contracting Covid-19 is never zero—neither inside a prison nor outside a prison. In Michigan (outside of prison), where Kennedy asks to be released,[2] the situation is bleak. As of December 31, 2020, Michigan's 7-day average of daily new cases sits at 2,736. The state is considered a place with the "highest COVID-19 risk level" indicating "unchecked community spread" of the virus. Wayne County currently has a 7-day average of 389 daily new cases and a frequency rate of 22.1 infections per 100,000 individuals—just under the state's 27.4 infections per 100,000 and an indication of "escalating community spread." Across the state, 526,932 people have been infected and 13,008 people have died.

---

[2] In his first renewed motion for compassionate release, Kennedy asserts he "has a suitable re-entry program established as he will be living with family in Detroit…." **ECF No. 290, PageID.1301.**

13

The Court might be wondering, in light of Covid-19, if Kennedy is safer inside prison or in Detroit. The Government urges the Court to avoid the "numbers" game, attempting to assess which location is safer from a Covid-19 perspective. Kennedy is at risk whether he is in prison or outside of prison. Risk level will change from month to month. Ashland, however, has made significant steps to minimize the risk and, as demonstrated by his medical records, has fully cared for Kennedy while Covid-19 affected inmates and staff at the facility. Given the totality of facts of this case, Kennedy should remain an inmate. Other courts have denied motions for compassionate release when Covid-19 affected inmates in the prison. *See United States v. Thomas*, 471 F.Supp.3d 745, 750 (W.D. Va. July 10, 2020) ("While Forrest City Low may have had 454 inmates test positive for COVID-19 by June 1, 2020 when Thomas filed his motion, today the BOP indicates that only 28 inmates and 1 staff member currently have COVID-19. That dramatic decrease in positive tests in a one-month timeframe demonstrates that the methods that Forrest City Low and the BOP are undertaking are working, including 'quarantines, limited contractor and volunteer access, a prohibition on social and legal visits, maximized social

14

distancing within the facilities, and additional cleaning and sanitizing of the prisons.'"); *United States v. Frost*, 2020 WL 3869294, at *4 (D.S.D. July 9, 2020) (Lange, C.J.) (inmate tested positive at Butner Low, which had huge outbreak, and suffers from many conditions, including type 2 diabetes mellitus, cardiomyopathy, and COPD; court finds circumstances not extraordinary); *United States v. Todd*, 2020 WL 3839702, at *2 (S.D. Fla. July 8, 2020) (court denies motion for a "high risk" defendant while recounting steps taken at FCI Oakdale I to stem early outbreak).

## Summary and Conclusion

Following the guidance provided by USSG § 1B.13(2), and considering the factors under 18 U.S.C. § 3553(a), Kennedy remains an unsuitable candidate for release. While at Ashland, despite pursuing education courses (Exhibit Five – Inmate Education Data, 12-16-20; Exhibit Six – Program Review, 11-5-20), he continues to struggle with following rules. Exhibit Seven – Inmate Discipline Data, 12-16-20 (sanctioned incidents on November 30, 2020, and March 28, 2019).

In the past, when not in prison, Kennedy actively pursued criminal activities. As the Court knows from the Government's response to his

15

initial motion for compassionate release, Kennedy's underlying identity theft and credit fraud scheme victimized thousands of people. **ECF No. 286, PageID.1240-1242.** Federal law enforcement encountered three firearms when searching Kennedy's residence. *Id.* at 1260. As of November 5, 2015, Kennedy had 17 aliases and 11 alternate IDs. PSR at pp. 2-3. With a Criminal History Category of VI, Kennedy's 19 criminal convictions spanned nearly 30 years and three different states (MI, KY, MO) – from 1988 (when he was 19) to his federal wire fraud conspiracy conviction in 2015. Nearly every conviction involved similar conduct—misrepresenting/falsifying identity with intent to obstruct, retail fraud, breaking and entering a vehicle to steal property, failure to obey, financial transaction device use, false pretenses, fraudulent use of credit/debit, criminal possession of a forged instrument, fleeing and evading police, resisting arrest, theft/stealing property, tampering with physical evidence, and federal wire fraud conspiracy. He also added assault and battery and trafficking in controlled substances to his litany of fraud-related convictions. *Id.* at ¶¶42-65.

Kennedy's criminal history shows that he would be a danger to himself and others if released. His past crimes involved direct contact

16

with people. Given the likelihood that he would be a repeat offender, Kennedy would be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order. For nearly his entire adult life, he committed crimes—using other people's identities—to make money. His crimes involved close contact with other people. His criminal history and spotty employment record strongly suggest he knows of no other way to make money. PSR at ¶¶ 79-81.

As the Court knows from the Government's response to Kennedy's initial motion, at his sentencing, Judge Battani was very concerned about the danger posed by Kennedy:

> I mean, this identity thing, which is basically what all of these involved, is a very serious threat. It is an economic threat to our economy, but also a very personal threat. People whose identity is stolen, that person is very fearful and it changes their whole perspective. I think we have all known people, if not ourselves, who have had their identity stolen, credit cards opened in their names, et cetera. It is a very -- it has a great impact on their life. Yes, it is not physically assaultive, but it hurts in another way, so it is very serious.

**ECF No. 231, PageID.963.** Judge Battani then sentenced Kennedy to the top of his guideline range, acknowledging that she made a mistake trusting that he would not commit more fraud while out on bond:

> I think that, in doing the top of the guidelines, I mean, this is one case, I have to tell you this is probably the first case that I can't

17

even remember going above the guidelines, because that's how serious I think this is. … And how much I don't want to make another mistake with you.

**ECF No. 231, PageID.966**.

Finally, as noted in the Government's response to the original motion, victims remain fearful of Kennedy: "As victim "E.M." stated within days of being notified of Kennedy's 5/26/20 Zoom hearing on his motion to modify sentence, "I still worry all the time about my stolen identity so he should serve every minute of his sentence."" **ECF No. 286, PageID.1261.**

In sum, the evidence does not support the compassionate release of Verdell Kennedy. His second renewed motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Patrick E. Corbett*
PATRICK E. CORBETT
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
313-226-9703

Dated: January 4, 2021

## CERTIFICATE OF SERVICE

      I hereby certify that on January 4, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all interested parties.

                                          *s/Patrick E. Corbett*
                                          Patrick E. Corbett, P41182
                                          Assistant U.S. Attorney
                                          211 W. Fort Street, Suite 2001
                                          Detroit, Michigan 48226